## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701,

WILDEARTH GUARDIANS
301 N. Guadalupe Street, Suite 201
Santa Fe, New Mexico 87501, and

FRIENDS OF THE EARTH,
1101 15th Street, 11th Floor
Washington, D.C. 20005,

        Plaintiffs,

    v.

DEB HAALAND, in her official capacity as
Secretary of the Interior
U.S. Department of the Interior
1849 C Street N.W.
Washington, DC 20240, and

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street N.W.
Washington, DC 20240,

        Defendants.

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, WildEarth Guardians, and Friends of the Earth (collectively referred to as "Conservation Groups") challenge the failure of Defendants U.S. Secretary of the Interior Deb Haaland and U.S. Department of Interior (collectively referred to as "Interior") to respond to the Conservation Groups' January 19, 2022, Petition for rulemaking to reduce the rate of oil and gas production on federal public lands.

2.      The overwhelming scientific consensus makes clear that we must limit global temperature rise to 1.5°C in order to avoid the worst and most disastrous consequences of climate change.  It is equally clear that in order to meet this limit, governments must halt the approval of new fossil fuel production *and* phase out existing fossil fuel production.  In light of the unprecedented climate crisis and the compelling need for swift, aggressive action to reduce and phase out fossil fuels, Interior's ongoing failure and delay in responding to the Conservation Groups' January 19, 2022, Petition is unreasonable and unlawful.

3.      The Administrative Procedure Act ("APA") requires each federal agency to give interested parties the right to petition for the issuance, amendment, or repeal of a rule.  5 U.S.C. § 553(e); *see also* 43 C.F.R. § 14.2.  Each agency must conclude a matter presented to it within a reasonable time.  5 U.S.C. § 555(b); *see also* 5 U.S.C. § 555(e).  Pursuant to Interior's regulations, a petition must be given "prompt consideration," with the petitioner "notified promptly of action taken."  43 C.F.R. § 14.3.

4.      Interior's failure to respond to the Conservation Group's Petition violates the APA, 5 U.SC. §§ 555(b), 555(e), and Interior's regulations, 43 C.F.R. § 14.3.

5.     Pursuant to the APA, the reviewing court shall compel agency action unreasonably delayed.  5 U.S.C. § 706(1).  Interior's ongoing fifteen-month delay in responding to the Conservation Group's Petition is unreasonable.

6.     The Conservation Groups respectfully request the Court to compel Interior to promptly respond to their Petition, as required by the APA.

JURSIDICTION

7.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 5 U.S.C. §§ 551 *et seq.*, because this action involves the United States as a defendant and arises under the laws of the United States, including the APA, 5 U.S.C. §§ 551 *et seq.*  An actual justiciable controversy exists between the Conservation Groups and Interior.  The requested relief is proper under 28 U.S.C. § 2201-02 and 5 U.S.C. § 706(1).  The challenged failure to act is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

VENUE

8.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendants reside and are headquartered in this district, Plaintiff Friends of the Earth resides and is headquartered in the district, and Plaintiff Center for Biological Diversity maintains an office in this district.

PARTIES

9.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit 501(c)(3) organization headquartered in Tucson, Arizona, with offices across the United States, including in Washington, DC, and in Mexico.  The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively

involved in protecting threatened and endangered species, and their habitat, nationwide and in Mexico. The Center has over 89,000 members throughout the United States and the world.

10.     Plaintiff WildEarth Guardians ("Guardians") is a nonprofit 501(c)(3) organization headquartered in Santa Fe, New Mexico. Guardians' mission is to protect and restore wildlife, wildlands, wild rivers, and health in the American West. Guardians has over 100,000 members and supporters, and maintains offices in Santa Fe, New Mexico; Denver, Colorado; Missoula, Montana; Boise, Idaho; Tucson, Arizona; Portland, Oregon; and Seattle, Washington. Through Guardians' Climate and Energy Program, the organization advocates for solutions to the climate crisis, one of the greatest existential threats to wildlife, wild places, wild rivers, and health in the western United States. Under its Climate and Energy Program, Guardians works toward significant reductions in greenhouse gases and a just and equitable transition away from fossil fuel production and consumption. Much of this work is focused on ensuring that the production of coal, oil, and gas from federally managed lands in the western U.S. is consistent with the need to reduce greenhouse gases and safeguard the climate.

11.     Plaintiff Friends of the Earth ("FoE") is a national non-profit conservation organization with offices in Berkeley, California and Washington, D.C., where it is headquartered, and staff located across the country. FoE is a membership organization consisting of more than 260,000 members and more than 6.3 million activists nationwide. FoE is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. FoE's mission is to protect our natural environment, including air, water, and land, to create a healthier and more just world. FoE utilizes public education, advocacy, legislative processes, litigation, and most importantly, open access to government processes and records, to achieve its organizational goals.

12.     Conservation Groups bring this action on their own behalf, and on behalf of their members.  Conservation Groups' members regularly use and enjoy the federal public lands, including specific public lands, waters, and areas that are adversely affected by ongoing oil and gas development.  Conservation Groups' members use and enjoy these public lands for a variety of purposes including hiking, fishing, hunting, camping, wildlife viewing, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Conservation Groups' members derive recreational, inspirational, religious, scientific, educational, and aesthetic benefit from their activities on these public lands.

13.     The aesthetic, recreational, scientific, educational, religious, and procedural interests of the Conservation Groups and their members have been and will continue to be adversely affected by oil and gas development on the federal public lands.  The adverse environmental impacts caused by oil and gas development are well-documented, and include air pollution, noise pollution that disrupts wildlife and recreational enjoyment, water use and the risk of water pollution, and increased road construction and truck traffic.  The adverse impacts of oil and gas development on federal public lands also include increasing the severity and effects of climate change.

14.     As an example, Center member Taylor McKinnon, a resident of Flagstaff, Arizona, enjoys regularly recreating around the San Juan River, which is being adversely affected by the UTU 052026 lease and other nearby leases, and around the Colorado River, which is being affected by the UTU 075761 lease and other nearby leases.  Mr. McKinnon's use and enjoyment of these areas is being diminished by the industrialization associated with the development of these leases, which is destroying the land, wildlife habitat, and viewsheds. Additionally, Mr. McKinnon's use and enjoyment of both of these rivers, including their

4

endangered fish, is being adversely affected by their decline in flow resulting in significant part from greenhouse gas pollution and climate change, and the associated regional aridification.

15.     WildEarth Guardian member Jeremy Nichols regularly travels to recreate on federal public lands in the Powder River Basin of Wyoming and Montana, including areas directly impacted by oil and gas development.  Mr. Nichols uses these federal public lands for hiking, searching for wildlife, searching for other unique natural artifacts, and enjoying the feeling of being away from it all.  More specifically, oil and gas development has a negative impact on the relatively undeveloped landscapes particularly enjoyed by Mr. Nichols in the Powder River Basin, through drilling, fracking, flaring, truck traffic, construction of pipelines, installation of tanks and compressor stations, development of processing facilities, and overall leading to an enormous influx of industrial development and traffic.  The development leads to air pollution, both directly from engines, flaring, and other sources, but also through the creation of haze and smog.  Oil and gas development inevitably has a negative impact on Mr. Nichols' recreational and aesthetic pursuits.

16.     The Conservation Groups' members also regularly use and enjoy areas, and observe wildlife species, that are being adversely affected by climate change.  One example is Brett Hartl, who is a member of the Center for Biological Diversity, WildEarth Guardians, and Friends of the Earth.  Mr. Hartl travels extensively across the United States to view many species of birds including whooping cranes, Hawaiian songbirds, snowy plover, piping plover, lesser prairie-chicken, eastern black rail, as well as many species of mammals including the San Joaquin kit fox, giant kangaroo rat, the San Joaquin antelope squirrel and grizzly bear.  These species are already threatened by sea level rise and the degradation of their habitats as temperature rise due to climate change.

17.     Additionally, Center member Robin Silver routinely travels to Mt. Graham, Arizona to observe and photograph the critically endangered Mt. Graham red squirrel, whose remaining cold mountaintop, microclimate continues to shrink and degrade as temperatures warm and wildfires become more intense and more frequent.  WildEarth Guardian member Mr. Nichols also enjoys searching for wildlife, including various species threatened by catastrophic climate change.  Mr. Nichols' ability to observe wildlife, including wolverine, Canada lynx, bull trout and other imperiled fish species, is imperiled by increased temperatures resulting from climate change.

18.     The Conservation Groups' members intend to continue to use and enjoy these federal public lands frequently and on an ongoing basis, including this spring, summer and fall, and into the future.  This includes specific lands and areas that are currently being adversely affected by oil and gas development, nearby lands, and areas within view of the lands affected by ongoing development, as well as the lands already adversely affected due to climate change.  For example, Center member Taylor McKinnon has a concrete and specific plan to return to the San Juan River in May of 2023.  WildEarth Guardians' member Jeremy Nichols intends to return to recreate on federally managed public lands in and near the Powder River Basin of Wyoming in May of 2023.  Brett Hartl, who is a member of all three plaintiff organizations, has plans to return to Wyoming in the fall of 2023 and the Central Valley of California in the winter of 2024.  And Center member Robin Silver will return to Mt. Graham in June, 2023.

19.     The Conservation Groups and their members' injuries will likely be redressed by the relief sought.  Had Interior considered and responded to the Conservation Groups' Petition within a reasonable timeframe, as required by the APA, Interior likely would have recognized the compelling need to significantly reduce the amount of oil and gas development on federal

public lands, including the specific lands and areas that the Conservation Groups' members regularly use and enjoy.  By taking such action, Interior would have reduced and mitigated the threat of oil and gas development on federal public lands, preventing the diminishment of the enjoyment of public lands used by Conservation Groups' members.  By taking such action, Interior would have also reduced fossil fuel use and development on federal public lands and thereby helped alleviate the risks, impacts, and severity of climate change on the particular areas and species that they enjoy.  A favorable ruling would ensure that as Conservation Groups' members continue to use and enjoy federal public lands affected by Interior's actions, as well as additional specific areas, their harms would be reduced, if not eliminated.

20.     Defendant Deb Haaland is sued in her official capacity as the Secretary of the Interior and is responsible for managing federal public lands and resources and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

21.     Defendant U.S. Department of the Interior is an executive department of the United States government that is responsible for the conservation and management of the nation's natural resources, including its federal public lands, wildlife and endangered species, resources, mineral estates, and cultural heritage.

## BACKGROUND

22.     On January 19, 2022, the Conservation Groups submitted the "Petition to Reduce the Rate of Oil and Gas Production on Public Lands and Waters to Near Zero by 2035" (hereinafter, "Petition") to President Biden and Secretary of the Interior Deb Haaland.  The Petition was submitted by 361 climate, conservation, environmental justice, public health,

indigenous, faith-based, and community organizations.  A copy of the Petition is provided as
Exhibit A.

23.     The Petition provided extensive legal and scientific support for the petitioned
action, as summarized below.  The Petition also provided text for the proposed regulations.

24.     After waiting over a year for a response to the Petition, the Conservation Groups
provided written notice to Interior on March 16, 2023, explaining that if a response to the
Petition was not received within thirty days, the Center would file suit under the APA in order to
compel the required response.

25.     As of the filing of this Complaint, Interior has not responded to the Petition.

26.     An overwhelming international scientific consensus has established and
confirmed that human-caused climate change is causing widespread human health,
environmental, and economic harms, and that climate change threats are becoming increasingly
dangerous.[1]  Fossil fuel-driven climate change has already led to more frequent and intense heat
waves, floods, and droughts; more destructive hurricanes and wildfires; rising seas and coastal
erosion; increased spread of disease; food and water insecurity; acidifying oceans; and increasing
species extinction risk and the collapse of ecosystems.[2]

---

[1] *See e.g*., Intergovernmental Panel on Climate Change, Climate Change 2014: Synthesis
Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the
Intergovernmental Panel on Climate Change (2014) at 2.
[2] U.S. Global Change Research Program, Climate Science Special Report: Fourth National
Climate Assessment, Vol. I (2017), https://science2017.globalchange.gov/; U.S. Global Change
Research Program, Impacts, Risks, and Adaptation in the United States, Fourth National Climate
Assessment, Volume II (2018), https://nca2018.globalchange.gov/.

27.     The harms from the climate crisis and fossil fuel pollution are not felt equally, but instead fall first and worst on Black, Brown, Indigenous, and other communities of color, as well as low-wealth and other frontline communities, worsening the environmental justice crisis.[3]

28.     The vast scientific literature documenting these findings has been set forth in a series of authoritative reports from the Intergovernmental Panel on Climate Change ("IPCC"), U.S. Global Change Research Program, and other institutions, which make clear that fossil-fuel driven climate change is a "code red for humanity."[4]  Without limits on fossil fuel production and deep and rapid emissions reductions, global temperature rise will exceed 1.5°C and will result in catastrophic damage in the United States and around the world.[5]

29.     The world's already developed, existing oil and gas fields and coal mines contain enough carbon to exceed the 1.5°C limit.  To meet a 1.5°C limit, most United States and global fossil fuels must remain undeveloped, including an immediate halt to new fossil fuel production and infrastructure, and a phase-out of existing production and infrastructure.[6]

---

[3]  Donaghy, Tim & Charlie Jiang for Greenpeace, Gulf Coast Center for Law & Policy, Red, Black & Green Movement, and Movement for Black Lives, Fossil Fuel Racism: How Phasing Out Oil, Gas, and Coal Can Protect Communities (2021), https://www.greenpeace.org/usa/wp-content/uploads/2021/04/Fossil-Fuel-Racism.pdf; U.S. Environmental Protection Agency, Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts, EPA 430-R-21-003 (2021), www.epa.gov/cira/social-vulnerability-report.

[4]  United Nations Secretary-General, *Secretary-General's statement on the IPCC Working Group 1 Report on the Physical Science Basis of the Sixth Assessment*, Aug. 9, 2021, https://www.un.org/sg/en/content/secretary-generalsstatement-the-ipcc-working-group-1-report-the-physical-science-basis-of-the-sixth-assessment.

[5]  Intergovernmental Panel on Climate Change, Summary for Policymakers. In: Global Warming of 1.5°C.  An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty (2018) [Masson-Delmotte, V. et al. (eds.)], https://www.ipcc.ch/sr15/.

[6]  Rogelj, Joeri et al., Energy system transformations for limiting end-of-century warming to below 1.5°C, 5 Nature Climate Change 519 (2015): Rogelj et al. (2015) estimated that a

30.     As detailed by University of Manchester's Tyndall Centre for Climate Change

Research, in order to preserve a 50% or better chance of avoiding 1.5°C of warming, the world's

developed countries, including the U.S., must cut oil and gas production by 74% by 2030 and

end it entirely by 2034.[7]  To maintain a 67% chance of avoiding 1.5°C of warming, the U.S.

must end oil and gas production entirely by 2031.[8]

31.     Researchers at Oil Change International project that the development of currently

operating oil and gas fields alone, even with no coal, would take the world beyond 1.5°C of

warming, and that 40% of the world's already producing fossil fuel reserves must remain

undeveloped to avoid 1.5°C of warming.[9]

32.     As detailed in the United Nations Production Gap Reports, fossil fuel producers

are planning to extract more than double the amount of oil, gas, and coal by 2030 than is

consistent with limiting warming to 1.5°C,[10] with United States oil and gas production projected

to increase twice as much as any other country.[11]

33.     The federal government has repeatedly recognized that human-caused climate

change is causing widespread and intensifying harms across the country.  As stated in the Third

National Climate Assessment: "observations unequivocally show that climate is changing and

reasonable likelihood of limiting warming to 1.5° or 2°C requires global CO2 emissions to be
phased out by mid-century and likely as early as 2040-2045.

[7]  Calverley, D. and Anderson, K. (2022), Phaseout pathways for fossil fuel production within
Paris-compliant carbon budgets. Tyndall Centre, University of Manchester, at 47, 54.

[8]  *Id.* at 47.

[9]  Kelly Trout et al., Existing fossil fuel extraction would warm the world beyond 1.5°C,
Environ. Res. Lett. (2022).

[10] SEI, IISD, ODI, E3G, and UNEP, The Production Gap: The discrepancy between countries'
planned fossil fuel production and global production levels consistent with limiting warming to
1.5°C or 2°C (2020).

[11] Ploy Achakulwisut & Peter Erickson, Trends in fossil fuel extraction: Implications for a shared
effort to align global fossil fuel production with climate limits, Stockholm Environment Institute
Working Paper (April 2021).

that the warming of the past 50 years is primarily due to human-induced emissions of heat-trapping gases.  These emissions come mainly from burning coal, oil, and gas."[12]

34.     The Fourth National Climate Assessment reported that "fossil fuel combustion accounts for approximately 85% of total U.S. greenhouse gas emissions," which is "driving an increase in global surface temperatures and other widespread changes in Earth's climate that are unprecedented in the history of modern civilization."[13]

35.     The National Climate Assessments make clear that the harms of climate change are long-lived, and that the choices we make now on reducing greenhouse gas pollution will affect the severity of the climate change damages that will be suffered in the coming decades and centuries.[14]

36.     In 2018, the IPCC issued a report that highlighted the necessity of limiting warming to 1.5°C to avoid catastrophic impacts to people and life on Earth.[15]  This report provides overwhelming evidence that aggressive reductions in fossil fuel emissions within this decade are essential to avoiding the most devastating climate change harms.

37.     According to the IPCC, the damages that would occur at 2°C warming compared with 1.5°C include significantly more deadly heatwaves, drought and flooding; additional sea

---

[12] Melillo, Jerry M et al. (eds.), Climate Change Impacts in the United States: The Third National Climate Assessment, U.S. Global Change Research Program (2014) at 2. *See also* Report Finding 1 at 15: "The global warming of the past 50 years is primarily due to human activities, predominantly the burning of fossil fuels."

[13] U.S. Global Change Research Program, Impacts, Risks, and Adaptation in the United States, Fourth National Climate Assessment, Volume II (2018), https://nca2018.globalchange.gov/ at 39, 60.

[14] *Id*. at 34.

[15] Intergovernmental Panel on Climate Change, Global Warming of 1.5°C, An IPCC special report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty (2018).

level rise; a greater risk of triggering the collapse of the Greenland and Antarctic ice sheets; dramatically increased species extinction risk, including the virtual elimination of coral reefs; a higher risk of heat-related deaths; reduced yields and lower nutritional value of staple crops; and a doubling of the people exposed to climate change-induced increases in water stress.[16]

38.    The 2018 IPCC report concludes that pathways to limit warming to 1.5°C require a rapid phase out of $CO_2$ emissions and deep emissions reductions in other greenhouse gas emissions and climate forcers.  In pathways consistent with limiting warming to 1.5°C, global anthropogenic $CO_2$ emissions must decline by about 45% below 2010 levels by 2030 and reach near zero around 2045 or 2050.[17]

39.    The United States has contributed more to climate change than any other country. The United States is the world's biggest cumulative emitter of greenhouse gas pollution, responsible for 25% of cumulative global $CO_2$ emissions since 1870, and is currently the world's second highest emitter on an annual basis and highest emitter on a per capita basis.[18]

40.    One quarter of total United States greenhouse gas emissions come from the extraction and end-use combustion of fossil fuels produced on federal lands.[19]  The carbon

---

[16] Intergovernmental Panel on Climate Change, Global Warming of 1.5°C, an IPCC special report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways (2018), at SPM-8 to SPM-14.
[17]  Rogelj, Joeri et al., Mitigation Pathways Compatible with 1.5°C in the Context of Sustainable Development.  In: Global Warming of 1.5°C, An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty (2018), https://www.ipcc.ch/sr15/ at Figure 2.6; also at Summary for Policymakers at 12-14.
[18] Le Quéré, Corinne et al., Global carbon budget 2018, 10 Earth Syst. Sci. Data 2141 (2018), at 2163, Figure 5.
[19]  Merrill, Matthew D. et al., Federal lands greenhouse gas emissions and sequestration in the United States—Estimates for 2005–14: U.S. Geological Survey Scientific Investigations Report 2018–5131 (2018) at 8.

emissions from the already leased fossil fuel resources on federal lands in the United States would alone exceed any remaining United States carbon budget for meeting the 1.5°C limit.[20]

41.     To meet a 1.5°C limit, most United States and global fossil fuels must remain undeveloped including an immediate halt to new fossil fuel production and infrastructure, and a phase-out of existing production and infrastructure within the next several decades.[21]

42.     Rather than reducing fossil fuel extraction and use, United States policies in recent years have aggressively promoted ever greater fossil fuel production and infrastructure including by enabling hydraulic fracturing, lifting the crude oil export ban, and providing billions in government subsidies to the fossil fuel industry.[22]

43.     Despite the global climate crisis, and as shown in the table below, onshore oil production on federal land in the United States has nearly tripled since 2012.[23]

---

[20]  *See for example*, Van den Berg, Nicole et al., Implications of various effort-sharing approaches for national carbon budgets and emission pathways, Climatic Change 162: 1805-1822 (2020), https://link.springer.com/article/10.1007%2Fs10584-019-02368-y (showing a range for the U.S. carbon budget for 2010-2100 of ~10 GtCO2 to -90 GtCO2 for a 1.5°C limit at Figure 4).

[21]  Rogelj, Joeri et al., Energy system transformations for limiting end-of-century warming to below 1.5°C, 5 Nature Climate Change 519 (2015): Rogelj et al. (2015) estimated that a reasonable likelihood of limiting warming to 1.5° or 2°C requires global CO2 emissions to be phased out by mid-century and likely as early as 2040-2045.

[22]  SEI, IISD, ODI, E3G, and UNEP, The Production Gap Report 2021 (2021), http://productiongap.org/2021report at 39.

[23]  https://usafacts.org/articles/how-much-oil-and-gas-comes-from-federal-territory/



**Oil production on federal land has nearly tripled since 2012**
Billions of barrels of oil produced since 2003, by location type

■ Native American Land  ■ Onshore Federal Territory  ■ Offshore Federal Territory

Data comes from the calendar year and not the fiscal year.
Chart: US Department of the Interior • Source: Natural Resources Revenue Data

44.    Oil production in the United States is projected to set new records in 2023 and 2024.[24]  According to the Biden administration: "U.S. oil production is almost 12 million barrels per day.  By the end of this year, it will be up by about one million barrels per day compared to when President Biden took office, and it is on track to reach a new annual high in 2023."[25]

45.    During the 2020 election, then-candidate Joe Biden promised "[n]o more drilling on federal lands. No more drilling, including offshore. No ability for the oil industry to continue to drill, period, ends, number one."[26]

46.    As recently as March 13, 2023, President Biden explained that climate change poses "an existential threat to humanity," and that if we let the temperature increase above 1.5°C, "we're done; there's no way to turn it around, according to the scientists that tell us."[27]

---

[24]  https://www.eia.gov/todayinenergy/detail.php?id=55299
[25]  https://www.whitehouse.gov/briefing-room/statements-releases/2022/10/18/fact-sheet-president-biden-to-announce-new-actions-to-strengthen-u-s-energy-security-encourage-production-and-bring-down-costs/
[26]  *CNN Democratic Presidential Primary Debate*, CNN (Mar. 15, 2020).
[27]   https://subscriber.politicopro.com/article/eenews/2023/03/14/biden-were-done-if-temps-rise-above-1-5-degrees-00087039.

47.     The following day, on March 14, 2023, President Biden further explained: "If we don't keep [warming] above 1.5 degrees Celsius . . . not go above that – we're going to damn our children to a circumstance that is going to be the only truly existential threat . . . other than nuclear war."[28]

48.     Federal data show, however, that the Biden administration has approved 6,430 permits for oil and gas drilling on federal public lands in its first two years, outpacing the Trump administration's 6,172 drilling-permit approvals in its first two years.[29]

49.     On March 20, 2023, United National Secretary-General Antonio Guterres confirmed, on the basis of the latest IPCC report, that in addition to phasing out coal by 2030, and ceasing all licensing or funding of new oil and gas, governments must establish "a global phase down of existing oil and gas production compatible with the 2050 global net zero target."[30]

50.     The IPCC released the final installment of its Sixth Assessment Report on March 20, 2023.  The report confirmed that there is a substantial "emissions gap" between current global commitments and pledges, and the pathways that would limit warming to 1.5°C.[31] The projected cumulative future carbon dioxide emissions over the lifetime of existing fossil fuel infrastructure exceed the total cumulative net carbon dioxide emission pathways that would limit warming to 1.5°C.[32]  The report determined that about 80 percent of coal, 50 percent of gas, and

---

[28]  https://subscriber.politicopro.com/article/eenews/2023/03/15/biden-to-hold-conservation-summit-at-interior-00087257.

[29]  *See* https://reports.blm.gov/reports/AFMSS.

[30]  https://www.un.org/sg/en/content/sg/statement/2023-03-20/secretary-generals-video-message-for-press-conference-launch-the-synthesis-report-of-the-intergovernmental-panel-climate-change.

[31]  Intergovernmental Panel on Climate Change, Synthesis Report of the Sixth Assessment Report, pp. 23-24, https://report.ipcc.ch/ar6syr/pdf/IPCC_AR6_SYR_LongerReport.pdf.

[32]  *Id*., p. 24.

30 percent of oil reserves cannot be burned and emitted if warming is limited to 2°C, and that significantly more reserves must remain unburned if warming is limited to 1.5°C.[33]

51.     As explained in the Conservation Groups' January 19, 2022 Petition, Interior has considerable authority and discretion to protect public health and welfare under the Mineral Leasing Act ("MLA"), the Federal Policy and Management Act ("FLPMA"), and other laws related to the management and protection of federal public lands, including concerning the leasing and development of fossil fuels.

52.     Under the MLA, for instance, Interior "may" lease lands that are known or believed to contain oil or gas deposits.  30 U.S.C. § 226(a).  The MLA provides that Interior may alter or modify from time to time the rate of prospecting and development and the quantity and rate of production under such plan.  30 U.S.C. § 226(m).  The MLA also requires that each lease shall contains provisions for the protection of the interests of the United States, and for the safeguarding of the public welfare.  30 U.S.C. § 187.

53.     The standard federal onshore lease form provides that each lessee is subject to the authority of Interior to alter or modify the quantity and rate of production under the lease.

54.     FLPMA clarifies and confirms that the exercise of Interior's authority and discretion under the MLA and mineral lease terms, to protect the public interest, is consistent with Congress' comprehensive statutory scheme for the management of federal public lands.  43 U.S.C. §§ 1701, *et seq*.  In enacting FLMPA, Congress declared that the federal public lands shall be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.  43 U.S.C. § 1701(a)(8).

---

[33] *Id.*

55.     In managing the public lands, including the fluid mineral program, FLPMA directs Interior to use and observe the principles of multiple use and sustained yield, and to weigh the long-term benefits to the public against short-term benefits.  43 U.S.C. § 1712(c), § 1732(a).  The multiple use mandate requires Interior to consider the present and future needs of the American people, and to take into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values.  43 U.S.C. § 1702(c).  Multiple use also requires the harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment.  *Id*.

56.     In managing the federal public lands, Interior must also take any action necessary to prevent the unnecessary or undue degradation of the lands.  43 U.S.C. § 1732(b).

57.     The National Park System Organic Act directs Interior to conserve the scenery, natural and historic objects, and wildlife by such means as will leave them unimpaired for the enjoyment of future generations.  54 U.S.C. § 100101(a).

58.     The laws governing the National Wildlife Refuge System require that Interior administer national wildlife refuges for the conservation, management, and where appropriate, restoration of fish, wildlife, and plant resources and their habitats for the benefit of present and future generations.  16 U.S.C. § 668dd(a)(2).  Interior must ensure that the biological integrity, diversity, and environmental health of the National Wildlife Refuge System is maintained for the benefit of present and future generations.  *Id*. at § 668dd(a)(4)(B).

59.     The climate emergency, as detailed within the Petition, poses an imminent, severe, unprecedented risk to human health and welfare.  To respond to and help alleviate the

expected consequences of this emergency, the Petition requests Interior to begin the managed

decline of oil and gas production from federal public lands.

**CLAIM FOR RELIEF**
**Defendants are in ongoing violation of the APA by failing**
**to timely respond to the Conservation Group's Petition.**

60.    Plaintiffs hereby incorporate all preceding paragraphs.

61.    The APA provides mandatory requirements governing the issuance of proposed

and final rules by federal agencies.  5 U.S.C. §§ 551–559.  The APA defines a "rule making" to

mean the "agency process for formulating, amending, or repealing a rule."  *Id.* § 551(5).

62.    The APA requires that "[e]ach agency shall give an interested person the right to

petition for the issuance, amendment, or repeal of a rule."  5 U.S.C. § 553(e).  Interior's

regulations similarly provide that under the APA, "any person may petition for the issuance,

amendment, or repeal of a rule."  43 C.F.R. § 14.2.

63.    The APA requires that, "within a reasonable time, each agency shall proceed to

conclude a matter presented to it."  5 U.S.C. § 555(b).  Interior's regulations require that an APA

petition "will be given prompt consideration and the petitioner will be notified promptly of

action taken."  43 C.F.R. § 14.3.

64.    An agency must give "prompt notice" of the "denial in whole or in part" of a

written petition, together with a "brief statement of the grounds for denial."  5 U.S.C. § 555(e).

65.    Interior's ongoing failure to consider and respond to the Conservation Group's

January 19, 2022 Petition is in violation of the APA, 5 U.S.C. §§ 553(e), 555(b), 555(e), and in

violation of the Interior's regulations, 43 C.F.R. § 14.3.

66.    The APA establishes judicial review provisions for agency actions that apply

unless other statutes preclude judicial review, or the action is committed to agency discretion by

law.  5 U.S.C. §§ 701–706.  "Agency action" is defined to include "the whole or a part of an

agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

*Id.* § 551(13).  Under the APA's judicial review provision, the reviewing court shall "compel

agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

67.    Public health and welfare are clearly at stake as result of the climate change crisis,

and there is no higher competing priority for Interior than meaningfully responding to and

addressing the unprecedented and urgent climate crisis by beginning the managed decline of oil

and gas production on federal lands.

68.    Interior's ongoing failure to respond to the Conservation Group's January 19,

2022, Petition constitutes agency action unreasonably delayed within the meaning of the APA.  5

U.S.C. § 706(1).

69.    The Court should compel Defendants to promptly respond to the Conservation

Group's Petition, as required by the APA.  5 U.S.C. § 706(1).

**RELIEF REQUESTED**

WHEREFORE, the Plaintiffs respectfully request that this Court:

A.    Declare that Defendants are in ongoing violation of the APA by failing to timely

respond to the Conservation Group's Petition;

B.    Compel Defendants to promptly respond to the Conservation Group's Petition;

C.    Award to the Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.    Grant the Conservation Groups such further relief as may be just, proper, and

equitable.

Dated April 25, 2023.                    Respectfully submitted,

                                         _/s/ William J. Snape, III_
                                         William J. Snape, III
                                         D.C. Bar No. 455266
                                         Center for Biological Diversity
                                         1411 K St. NW, Suite 1300
                                         Washington, D.C. 20005
                                         American University Law School
                                         4300 Nebraska Ave NW,
                                         Washington, DC 20016
                                         Phone: 202-536-9351
                                         Email: bsnape@biologicaldiversity.org
                                                wsnape@wcl.american.edu

                                         Marc D. Fink
                                         MN Bar No. 343407, _pro hac vice applicant_
                                         Center for Biological Diversity
                                         209 East 7th Street
                                         Duluth, Minnesota 55805
                                         Phone: 218-464-0539
                                         Email: mfink@biologicaldiversity.org

                                         _Attorneys for Plaintiffs_